**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
EL PASO DIVISION**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Criminal Action No. 3:09-CR-1402-KC |
| | § | |
| **ROBERTO AARON OLIVAS,** | § | |
| | § | |
| Defendant. | § | |
| | § | |

## ORDER

On this day, the Court considered Defendant Roberto Aaron Olivas's Motion to Suppress Physical Evidence and Statements ("Motion") (Doc. No. 45) and the Government's Response to Defendant's Motion to Suppress ("Response") (Doc. No. 48). The Court has reviewed the parties' briefs, the submitted evidence and the testimony elicited at the July19, 2009 evidentiary hearing. Defendant's Motion is **DENIED**.

### I. BACKGROUND

#### A. Facts

The following facts are obtained from the Affidavit of Special Agent Carmelo Viera ("Affidavit"), which is attached to the Criminal Complaint, and from the witnesses' testimony at the July 10, 2009 evidentiary hearing.

On April 14, 2009, Special Agent Viera and Special Agent Joel Rodriguez (collectively "Agents") of the Immigration and Customs Enforcement Agency were conducting surveillance at 270 Luna Street, El Paso, Texas ("the premises"). The premises consisted of an automobile repair and service shop which included large enclosed structure, a gated open area, and an

adjacent office. *See* Gov't's Ex. 1. The surveillance began at approximately 9 a.m. At approximately 12:45 p.m., the Agents observed Jorge Antonio Mendez ("Mendez") arrive at the premises in a Chevy Tahoe. Mendez had previously been observed on the premises and had, on numerous occasions, been observed to be in contact with known narcotics traffickers in the El Paso area. Mendez himself was also known to be a narcotics trafficker, with at least one arrest by the El Paso Police Department ("EPPD") for a narcotics-related offense. Not long after arriving, Mendez entered the premises.

Several minutes after Mendez arrived, a green Ford pick-up truck arrived outside the premises. The Agents later identified the driver of the Ford pick-up truck as Enrique Robert Hidalgo. After arriving outside the premises, Hidalgo waited thirty minutes before being allowed to enter.

At about this time, Agent Viera requested an EPPD "K-9" unit to conduct an exterior "sniff" of the premises. Agent Viera also intended to do a subsequent "knock and talk" with those present on the premises.[1] Officer Sal Vargas responded to the scene with "Ringo," a seven-year-old male Belgian Malinois dog. Officer Vargas is a twenty-two-year veteran of the EPPD and has been assigned to the EPPD Narcotics Task Force for the last eight years as a Narcotics Detector Dog Handler and Trainer. Officer Vargas has worked as a K-9 dog handler for the last seventeen years. Officer Vargas has specifically worked with Ringo for the last five years. Together, Officer Vargas and Ringo are certified as a "Narcotics Detection Team" by the National Narcotic Detector Dog Association, with their most recent certification in March 2009. Ringo has been certified to detect the odors of marijuana, cocaine, heroin and methamphetamine.

At approximately 2:20 p.m., per the Agents' request, Officer Vargas led Ringo to conduct

---

[1] Viera described a knock and talk as "a method that we use to approach a residence or individuals in order to get consent and further investigation."

an exterior sniff of the premises. Officer Vargas and Ringo walked along the side of the building and up to the gated area of the premises. Upon approach to the gated area of the premises, Ringo immediately alerted to the odor of a controlled substance emanating from under the main entrance gate.

At this point, Agent Viera conducted his first knock and talk. Agent Viera knocked on the gate, called Mendez by name, identified himself as law enforcement, and stated that he needed to talk to the people inside. After one or two minutes, Agent Viera observed Mendez appear through the side opening of the gate and made eye contact with him. However, Mendez did not comply with Agent Viera's request to approach and speak to him. Instead, another minute or two passed. Then, Mendez jumped over the fence of the premises and ran toward an adjoining street. Agent Rodriguez pursued Mendez and placed him in custody two blocks away. Agent Viera then joined Agent Rodriguez and asked Mendez if anyone was left on the premises. At first, Mendez denied having been on the premises. After morning questioning, Mendez stated that there were people who remained on the premises.

Some time after Agent Rodriguez placed Mendez in custody, Agent Viera returned to the gated area outside the premise and began a second knock and talk. At this point, Agent Viera noticed that all noise inside the premises ceased. Suddenly, Agent Vierra began to hear loud movements inside the premises and what sounded like running water. Agent Viera also noticed a strong odor of gasoline emanating from under the main entrance of the premises. Agent Viera also heard noises from inside the premises that sounded like metal being slammed on concrete, power tools being operated, and footsteps moving from side to side. Based on these observations, the Agents believed that the individuals inside the premises were in the process of destroying the controlled substances the Agents believed were inside.

Agent Viera continued his second knock and talk. This lasted for approximately ten to fifteen minutes, during which time no one responded. Finally, Defendant came out and approached the Agents. As soon as he emerged from one of the buildings on the premises, Agent Rodriguez restrained Defendant and asked him if there were others still inside. Defendant answered there were others still inside. The Agents and other law enforcement on the site then entered the premises.[2]

Once inside the premises, the Agents found Hidalgo and two other individuals. The Agents seized these individuals and then conducted a security sweep for additional individuals hiding inside the premises. During the security sweep, the Agents observed numerous taped wrapped bundles of marijuana in plain view inside a blue Honda Civic LX. Based on this observation, the Agents obtained a search warrant for the premises. The subsequent search yielded 150.017 pounds of marijuana and $16,800.00 in United States currency. *See* Gov't's Ex. 2.

**B.     Procedure**

On May 13, 2009, a Grand Jury sitting in El Paso, Texas, returned an Indictment charging Defendant, Mendez and Hidalgo with Conspiracy to Possess a Controlled Substance with Intent to Distribute in violation of 21 U.S.C. §§ 846 & 841(a)(1) and with Possession with Intent to Distribute a Controlled Substance in violation of 21 U.S.C. § 841(a)(1).[3] *See* Indictment 1-2. On June 23, 2009, Defendant filed his Motion, arguing that the Agents violated his Fourth

---

[2] There is conflicting testimony as to whether Defendant gave the Agents consent to enter the premises. Because the Court holds that the Agents had probable cause and exigent circumstances to enter the property without Defendant's consent, the Court need not resolve this issue of fact.

[3] Both counts identified the amount as "50 kilograms or more of a mixture or substance containing a detectable amount of marijuana" in further violation of 21 U.S.C. § 841(b)(1)(C). *See* Indictment 1-2.

Amendment rights protecting him from illegal search and seizure when they entered the premises without probable cause or exigent circumstances. The Government filed its Response on July 1, 2009.

This Court set a hearing for July 10, 2009. At the hearing, Agent Viera, Agent Rodriguez, Officer Vargas and Defendant testified.

**II.   DISCUSSION**

The Fourth Amendment states:

> [t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

U.S. CONST. AMEND. IV.

When seeking to enter private property absent a warrant or consent, the Fourth Amendment requires that any search or seizure "must have been supported by probable cause and necessitated by exigent circumstances." *United States v. Rodea*, 102 F.3d 1401, 1404 (5th Cir. 1997) (quoting *United States v. Carillo-Morales*, 27 F.3d 1054, 1060 (5th Cir. 1994)); *see also Payton v. New York*, 445 U.S. 573, 587-88 (1980). [4]

Defendant argues that the Agents violated his Fourth Amendment rights when the Agents performed a search of the Luna Street premises without a warrant and without probable cause or exigent circumstances. Def.'s Mot. 5-8. Defendant further argues that even if there was probable cause and exigent circumstances to search the premises, the Agents manufactured those exigent

---

[4] Most courts cited in this Order that apply the "probable cause and exigent circumstances" standard do so in the context of a person's dwelling. In the instant case, the premises is a commercial automobile repair shop, which, as the Court notes *infra*, carries a diminished expectation of privacy. However, the Fifth Circuit has applied the "probable cause and exigent circumstances" standards to the search of cars and automobile repair shops. *See Carillo-Morales*, 27 F.3d at 1061.

circumstances by knocking on the gate of the premises when they could have sought a warrant. *Id.* at 7-8. The Court addresses these arguments seriatim.

### A. Probable Cause

Defendant first argues that the Government failed to demonstrate that the Agents had probable cause to enter the premises. Def.'s Mot. 6-7. The Government argues that the presence of a known drug trafficker, Ringo's alert to the presence of a controlled substance under the front of the main gate, Mendez's flight, and his subsequent false statements to Agents demonstrate the Agents had probable cause to enter the property, seize the individuals and perform a protective sweep of the premises. Gov't's Resp. 4.

"Probable cause exists when facts and circumstances within the knowledge of the arresting officer would be sufficient to cause an officer of reasonable caution to believe that an offense has been or is being committed." *Carillo-Morales*, 27 F.3d at 1062 (citing *United States v. De Los Santos*, 810 F.2d 1326, 1336 (5th Cir.), *cert. denied*, 484 U.S. 978 (1987)). "The arresting officer does not have to have personal knowledge of all the facts constituting probable cause; it can rest upon the collective knowledge of the police when there is communication between them." *De los Santos*, 810 F.2d at 1336 (citing *United States v. Webster*, 750 F.2d 307, 327 (5th Cir. 1984), *cert. denied*, 471 U.S. 1106 (1985)). Ultimately, the Court must review the totality of the circumstances known to the Agents at the time to determine whether probable cause exists. *Ramirez v. Knoulton*, 542 F.2d 124, 129 (5th Cir. 2008) (citing *Tennessee v. Garner*, 471 U.S. 1, 11 (1985)).

The first indication of probable cause is Ringo's alert to the presence of controlled substances under the gate of the premises. The Fifth Circuit has held that "[a] drug-sniffing canine alert is sufficient, standing alone, to support probable cause for a search". *Resendiz v.*

*Miller*, 203 F.3d 902, 903 (5th Cir. 2000) (citing *United States v. Williams*, 69 F.3d 27, 28 (5th Cir. 1995) (citing *United States v. Seals*, 987 F.2d 1102, 1107 (5th Cir.), *cert. denied*, 510 U.S. 853 (1993))). However, in these cases, the sniff was conducted on a vehicle, not a home or business. *See, e.g., Resendez*, 203 F.3d at 903-04; *Williams*, 69 F.3d at 28; *Seals*, 987 F.2d at 1107; *see also United States v. Outlaw*, 319 F.3d 701, 704 (5th Cir. 2003) (dog sniff alert on a suitcase created reasonable and individualized suspicion to inspect bus passengers' tickets and question defendant, whose claim ticket matched suitcase); *United States v. Garcia-Garcia*, 319 F.3d 726, 730 (5th Cir. 2003) (drug sniff alert in the aisle of a bus at border checkpoint created reasonable suspicion). There is "a long-recognized distinction between stationary structures and vehicles" regarding the privacy interests recognized under the Fourth Amendment. *California v. Carney*, 471 U.S. 386, 390 (1985). Because of this distinction, "less rigorous warrant requirements govern [vehicles] because the expectation of privacy with respect to one's automobile is significantly less than that relating to one's home or office." *Id.* (quoting *South Dakota v. Opperman*, 428 U.S. 364, 367 (1976)).

Because of the "less rigorous warrant requirements" governing the search of a vehicle, the Court does not read the above-cited Fifth Circuit authority to hold that a dog sniff, taken alone, is sufficient for a finding of probable cause to search an entire home or commercial property, particularly where, as here, the property encompasses nearly half a city block. *See* Gov't's Ex. 1. Nor is there any binding authority holding that an alert necessarily provides probable cause to search a home or commercial property when a known drug trafficker is present.[5] Nevertheless,

---

[5] Indeed, there is merit to the argument that an alert from a detector dog, even when that dog is well-trained, cannot by itself constitute probable cause to search under any circumstances. As Justice Souter said in his dissent in *Illinois v. Caballes*, 543 U.S. 405 (2005):

> The infallible dog, however, is a creature of legal fiction. . . . [T]heir supposed infallibility is belied by judicial opinions

the cases cited above clearly demonstrate that an alert is at the very least an affirmative factor in establishing probable cause.

In addition to Ringo's alert to a controlled substance on the premises, the evidence shows that Mendez, a known drug trafficker who was under surveillance for drug trafficking activity, entered the premises. "A person's mere propinquity to others independently suspected of criminal activity does not, without more, give rise to probable cause to search that person." *United States v. Hearn*, 563 F.3d 95, 103 (5th Cir. 2009) (quoting *Ybarra v. Illinois*, 444 U.S. 85, 91 (1979)) (internal brackets omitted). "However, proximity is not irrelevant; reasonable inferences may be drawn from a person's connection to the criminal activity." *Id.* (citing, inter alia, *Maryland v. Pringle*, 540 U.S. 366, 372 (2003)).

The evidence also shows that when Agent Viera first knocked on the front gate, announced himself as law enforcement, and called to Mendez by name, Mendez made eye contact with Agent Viera, ignored his request to open the gate, jumped the fence, and ran. Flight from law enforcement by a suspected criminal does not in itself create probable cause; however, flight is "among the relevant contextual considerations in the probable cause analysis." *United States v. Newman*, 472 F.3d 233, 237 (5th Cir. 2006) (citing *United States v. Vega*, 221 F.3d 789, 799 (5th Cir. 2000)); *see also Illinois v. Wardlow*, 528 U.S. 119, 120 (2000) (finding flight from police amounted to reasonable suspicion).

---

describing well-trained animals sniffing and alerting with less than perfect accuracy, whether owing to errors by their handlers, the limitations of the dogs themselves, or even the pervasive contamination of currency by cocaine. [Cites cases]. In practical terms, the evidence is clear that the dog that alerts hundreds of times will be wrong dozens of times.

*Caballes*, 543 U.S. at 411-12 (Souter, J., dissenting); *see also* Richard E. Myers II, *Detector Dogs and Probable Cause*, 14 GEO. MASON L. REV. 1, 2 (2006) (applying Bayesian analysis to demonstrate that relying on an alert by a properly trained dog as prima facie evidence of the presence of contraband is based on flawed statistical analysis).

Finally, once Mendez was apprehended, his initial response to the Agents was that he had not just come from the premises, which was not true. False statements to law enforcement officers can contribute to probable cause. *See United States v. Rodriguez*, 835 F.2d 1090, 1093 (5th Cir. 1988); *United States v. Herbst*, 641 F.2d 1161, 1168 (5th Cir. 1981).

Given the totality of the circumstances, the Court holds that the alert of a trained detector dog for a controlled substance on the premises, the presence of a suspected drug trafficker on the premises, the flight of that suspect from the premises after acknowledging and ignoring identified law enforcement, and the suspect's subsequent false statements about his actions together demonstrate that the Agents had probable cause to enter the premises, seize the individuals and perform a security sweep of the premises. *See Newman*, 472 F.3d at 237 (district court did not commit plain error when it found probable cause based on law enforcement's knowledge of known drug dealer on premises, presence of security system, man fleeing premises, and suspicious movements behind a curtain). The question remains, however, whether the Agents had the exigent circumstances necessary to enter the premises without a warrant.

Defendant raises several collateral arguments to challenge probable cause. Defendant first argues that the Government has failed to show that Ringo is reliable. Def.'s Mot. 6 (citing *United States v. Cruz-Roman*, 312 F. Supp. 2d 1355, 1363 (W.D. Wa. 2004) (no probable cause based on canine's alert when dog not shown to be reliable)). Defendant's argument is directly contradicted by the evidence, which specifically demonstrates that Officer Vargas and Ringo are certified as a "Narcotics Detection Team" by the National Narcotic Detector Dog Association. Moreover, Ringo has been certified to detect the odors of marijuana, cocaine, heroin and methamphetamine. Vargas and Ringo have worked together for five years and were last certified in March of this year. The Court finds this evidence sufficient to demonstrate Ringo was

reliable. *Cf. Outlaw*, 319 F.3d at 704 ("It is undisputed that this drug-detecting team successfully completed all standard training procedures for border patrol drug-detecting teams and that this canine was certified to detect a variety of [controlled substances]."). The Fifth Circuit has further held that "a showing of the dog's reliability is not required if probable cause is developed on site as a result of a dog sniff . . . ." *Williams*, 69 F.3d at 28. Accordingly, Defendant's argument fails.

Defendant also argues that Ringo's sniff of the outside of the property was "arguably" a search which impermissibly took place before the Agents had probable cause and exigent circumstances. Def.'s Mot. 6. The Fifth Circuit noted in 1982 that "the majority view is that the sniffing of objects by a dog is not a search." *Horton v. Goose Creek Indep. Sch. Dist.*, 690 F.2d 470, 476 (5th Cir. 1982) (holding that dogs' sniffing of student lockers in public hallways and automobiles in public parking lots not a search), *cert. denied*, 463 U.S. 1207 (1983); *see also United States v. Reed*, 131 F.3d 644, 650 (6th Cir. 1998) (stating categorically that a canine sniff not a search within meaning of Fourth Amendment). Moreover, the one case Defendant cites for the contrary position, *United States v. Thomas*, 757 F.2d 1359 (2d. Cir. 1985), involved the limited question of whether a dog sniff of an individual's personal residence is a search. *See Thomas*, 757 F.2d at 1367. The court in *Thomas* further noted that a person has a "heightened privacy interest . . . in his dwelling place." *Id.* In the instant case, the property in question is not a private dwelling but a commercial automobile repair shop. Many courts have roundly criticized *Thomas* for its holding, and they have further noted a diminished expectation of privacy when a search occurs in a commercial location. *See, e.g., United States v. Lingenfelter*, 997 F.2d 632, 637 (9th Cir. 1993) (criticizing *Thomas* and holding dog sniff of a commercial warehouse not a "search" for Fourth Amendment purposes); *United States v. Vasquez*, 909 F.2d 235, 237 (7th Cir. 1990) (sniff of a garage from a public alley not a search); *United States v.*

*Colyer*, 878 F.2d 469, 475 (D.C. Cir. 1989) (criticizing *Thomas* and holding canine sniff of sleeper car in train not a search); *United States v. Hogan*, 122 F. Supp. 2d 258, 369 (E.D. N.Y. 2000) (noting *Thomas* is in conflict with Supreme Court precedent, and holding that sniff along the front of an uninhabited house and garage door is akin to commercial setting and therefore not a search); *Garcia v. United States*, No. EP-04-CA-447-DB, 2007 WL 4234173, at *7 (W.D. Tex. Nov. 28, 2007) (dog sniff of warehouse mail slot permissible).[6]

In addition, courts have further recognized that "a possessor of contraband can maintain no legitimate interest in 'privately' possessing cocaine." *Cota-Lopez*, 358 F. Supp. 2d at 592 (citing *United States v. Place*, 462 U.S. 696, 707 (1983)); *United States v. Jacobsen*, 466 U.S. 109, 123 (1984)). Therefore, a dog sniff in the context of a commercial property does not infringe on any legitimate privacy interests because "(1) it discloses *only* the presence or absence of a contraband item, and (2) its use 'ensures that the owner of the property is not subjected to the embarrassment and inconvenience entailed in less discriminate and more intrusive investigative methods.'" *Lingenfelter*, 997 F.2d at 637 (quoting *United States v. Beale*, 736 F.2d 1289, 1291 (9th Cir.) (en banc), *cert. denied*, 469 U.S. 1072 (1984) (quoting *Place*, 462 U.S. at 707)).[7]

---

[6] Even if the premises had been a private dwelling, courts within the Western District of Texas have held that a dog sniff of a private dwelling's front door does not constitute a search. *United States v. Cota-Lopez*, 358 F. Supp. 2d 579, 592 (W.D. Tex. 2002); *see also United States v. Tarazon-Silva*, 960 F. Supp. 1152, 1162 (W.D. Tex. 1997) (dog sniff of residence's "curtilage" not a search); *aff'd on other grounds*, 166 F.3d 341, (5th Cir. 1998) (unpublished) (holding that dog sniff taking place on outer edge of garage of private dwelling did not even warrant the reasonable expectation of privacy afforded to a "curtilage").

[7] The Court notes that the Supreme Court's decision of *Kyllo v. United States*, 533 U.S. 27 (2001), may undercut some of the reasoning that supports the proposition that a dog sniff is not a search under certain circumstances. *See Kyllo*, 533 U.S. at 37 (use of thermal imaging to measure heat emanating from home a search under the Fourth Amendment); *id.* at 47-48 (Stevens, J., dissenting) (noting that the rule adopted by the majority potentially places it at odds with the holding in *Place* and that such a rule would "embrace mechanical substitutes for dogs trained to react when they sniff narcotics"); *United States v. Richard*, 2001 WL 1033421, *6 n.4 (W.D. La. Aug. 29, 2001) (comparing the impermissible use of heat sensor imagery used in *Kyllo* with dog sniffs).

Therefore, given the above-cited precedent and authority, Defendant's argument that the dog sniff is a search under the instant circumstances is without merit.

Finally, Defendant argues that the Government's knocking and announcing themselves at the premises' gate was an impermissible seizure, as it also took place before the Agents had probable cause or exigent circumstances. Def.'s Mot. 6. "Consensual encounters in which an individual voluntarily and willingly agrees to speak to the police are not seizures and may be initiated by police without probable cause." *United States v. Fernandes*, 285 Fed. App'x 119, 122-23 (5th Cir. 2006) (citing *Florida v. Bostick*, 501 U.S. 429, 434 (1991)).[8] The Supreme Court has held that mere questioning of an individual by the police does not result in a seizure, "[s]o long as a reasonable person would feel free to disregard the police and go about his business." *Bostick*, 510 U.S. at 434. The Fifth Circuit has recognized the "knock-and-talk" strategy to constitute a reasonable, noncustodial investigative tool. *Fernandes*, 285 Fed. App'x at 123 (citing *United States v. Jones*, 239 F.3d 716, 720 (5th Cir. 2001)); *United States v. Gould*, 364 F.3d 578, 590 (5th Cir. 2004) (en banc)). In determining whether the Agent's interactions with the responding parties constitute a consensual encounter or a seizure, the Court must consider the totality of the circumstances surrounding the incident from the perspective of an innocent person. *Id.* (citing *United States v. Chavez*, 281 F.3d 479, 483-84 (5th Cir. 2002)).

The Agents twice performed a knock and talk at the premises. The first knock and talk was performed shortly after Ringo alerted. At that time, Agent Viera knocked, announced himself, and called for Mendez. This knock and talk took place for at most a couple of minutes

---

However, because *Kyllo* involved the search of a home and not a commercial property, and because both *Place* and *Jacobsen* remain good law, the Court will not attempt to resolve any theoretical conflicts raised between these cases.

[8] *Fernandes* is an unpublished opinion with limitations regarding its precedential value. However, the Court only cites the case here when quoting other precedential published opinions.

and did not involve any commands or physical apprehensions until after Mendez took flight. There is nothing in the evidence demonstrating that the Agents' initial knock and talk and Viera's request to speak to Mendez amounted to a seizure.

The second knock and talk took place after Mendez was apprehended. The Agents knocked on the gate for ten to fifteen minutes, and when Defendant emerged, he was immediately apprehended. The Agents' later apprehension of Defendant when he emerged from the property was certainly a seizure, but it is immaterial whether the Agents' actions leading up to Defendant's apprehension may have also have been a seizure. At the point the Agents engaged in their second knock and talk and seized Defendant and the property, the Agents already had probable cause and exigent circumstances to seize and perform a security sweep of the property.

Accordingly, Defendant's arguments that the Agents seized the property before establishing probable cause fail.

### B. Exigent Circumstances

Defendant next argues that even if the Agents had probable cause to enter and perform an initial security sweep of the premises, they lacked exigent circumstances that permitted them to do so without a warrant. Def.'s Mot. 7-8.

Both probable cause and exigent circumstances are necessary to justify a warrantless entrance upon a person's property. *See Jones*, 239 F.3d at 719 (citing *Steagald v. United States*, 451 U.S. 204, 211 (1981); *Payton*, 445 U.S. at 586; *Vega*, 221 F.3d at 798). "Exigent circumstances 'include those in which officers reasonably fear for their safety, where firearms are present, or where there is a risk of a criminal suspect's escaping or fear of destruction of evidence.'" *United States v. Rico*, 51 F.3d 495, 501 (5th Cir. 1995) (quoting *United States v. Mendoza-Burciaga*, 981 F.2d 192, 196 (5th Cir. 1992), *cert. denied*, 510 U.S. 926 (1993)). The

burden is on the government to prove exigent circumstances existed. *Id.* (citing *United States v. Thompson*, 700 F.2d 944, 946 (5th Cir. 1983)).

The Fifth Circuit has identified a non-exhaustive list of factors the Court must look to in determining whether exigent circumstances existed at the time of entry onto a property:

> 1) the degree of urgency involved and the amount of time necessary to obtain a warrant;
> 2) the reasonable belief that contraband is about to be removed;
> 3) the possibility of danger to the police officers guarding the site of contraband while a search warrant is being sought;
> 4) information indicating the possessors of the contraband are aware that the police are on their trail; and
> 5) the ready destructibility of the contraband and the knowledge that efforts to dispose of narcotics and to escape are characteristic behavior of persons engaged in the narcotics traffic.

*Hearn*, 563 F.3d at 105 (citing *Rico*, 51 F.3d at 501 (additional citations omitted)); *see also Jones*, 239 F.3d at 720; *Rodea*, 102 F.3d at 1405.

When determining whether exigent circumstances exist, the Court must also consider "the appearance of the scene of the search in the circumstances presented as it would appear to reasonable and prudent men standing in the shoes of the officers." *Hearn*, 563 F.3d at 105-06 (quoting *Rodea*, 102 F.3d at 1405). The Court must further review "the totality of the circumstances leading up to the challenged entry or search rather than on the isolated actions of law enforcement." *Id.* at 106 (citing *United States v. Howard*, 106 F.3d 70, 74 (5th Cir. 1997)). "If reasonable minds could differ, [a court] will not 'second-guess the judgment of experienced law enforcement officers concerning the risks of a particular situation.'" *Id.* (quoting *United States v. Blount*, 123 F.3d 831, 838 (5th Cir. 1997)).

After Agent Viera knocked on the gate the first time and announced themselves, Mendez appeared but ignored the Agents. Mendez then jumped a fence and fled the premises. At that point, it was reasonable for the Agents to assume that those in the premises were alerted to the

Agents' presence and that they were in the process of destroying any controlled substances. Seeking a warrant at this time would likely have led to unreasonable delay and the destruction of evidence. *See Newman*, 472 F.3d at 239 (noting a "fence jumper's responsibility in giving rise to the exigency"); *Rodea*, 102 F.3d at 1407 (finding exigent circumstances when one of the occupants fled when the Agents first arrived); *Rico*, 51 F.3d at 501 n.10 (finding exigent circumstances when suspect fled the premises, noting, "if you are standing around in the front yard arresting people in the driveway, you need to make sure that there is not assistance to him by people in other parts of the premises . . . [o]r we hasten to add, that suspects inside are destroying evidence.").

    The evidence also shows that after knocking and announcing their presence, the Agents noticed that all sound on the premises ceased. A short time later, the Agents heard renewed movements inside the premises, running water, metal being slammed on concrete, power tools being operated, and footsteps moving from side to side. Agent Viera also noticed for the first time a strong odor of gasoline emanating from under the main entrance of the premises. Many of these sounds are typical of an automobile body shop. Taken alone, they are unlikely to represent exigent circumstances. However, the sudden ceasing and recommencing of these sounds in earnest after the Agents performed their second knock and talk are consistent with the conclusion that those inside recognized the presence of law enforcement and began destroying evidence. This is particularly true in light of the fact that no one attempted to respond the Agents' continued knocking for ten to fifteen minutes even though the premises was a commercial business. *See Rodea*, 102 F.3d at 1408 (the sound of persons running around inside a mobile home after the Agents had been detected contributed to a reasonable determination of exigent circumstances);

*Newman*, 472 F.3d at 238 (human movement from behind a curtain that did not respond to verbal announcements contributed to exigent circumstances).

In conclusion, Mendez's decision to jump the fence, the sudden ceasing and recommencing of noise, and the failure of anyone in a commercial establishment to respond to the Agents' second knock and talk for ten to fifteen minutes could lead a reasonable law enforcement officer to the belief that those remaining in the premises were destroying or concealing evidence of a crime. Therefore, exigent circumstances existed to justify the Agents seizing the premises and performing a security sweep of the premises without a warrant.

### C. Manufactured Exigent Circumstances

Defendant next argues that even if exigent circumstances existed at the time the Agents entered the premises, the Agents had manufactured those circumstances by knocking and announcing their presence. Def.'s Mot. 7-8.

"Officers may not impermissibly create exigent circumstances by revealing their presence in order to alert suspects who would, in response, destroy evidence or put the police in danger." *Newman*, 472 F.3d at 238 (citing *Vega*, 221 F.3d at 800). "Exigencies can be manufactured guilelessly or ulteriorly." *Rico*, 51 F.3d at 502. Indeed, "the danger to constitutional rights more often comes from zealous officers rather than faithless ones." *Id.* (additional citations and internal quotes omitted). Therefore, the Court follows a two-step process in determining whether the Agents manufactured their own exigent circumstances. First, the Court must determine whether the officers created the exigent circumstances in bad faith. *Gould*, 364 F.3d at 590 (citing *Rico*, 51 F.3d at 502). Second, if there is no bad faith, the Court must determine "whether [the Agents'] actions creating the exigency were sufficiently unreasonable and improper as to

preclude dispensation with the warrant requirement." *Id.* (citing *Rico*, 51 F.3d at 502); *see also Jones*, 239 F.3d at 720 (quoting *Blount*, 123 F.3d at 838) (a court must "focus on the 'reasonableness of the officers' investigative tactics leading up to the warrantless entry.'").

The Court finds no evidence that the Agents acted in bad faith to create exigent circumstances. Indeed, no testimony was elicited from which the Court could infer that the Agents acted with the intent to create exigent circumstances when they approached the premises and performed a "knock and talk." *See Gould*, 364 F.3d at 590 ("Here, there is no finding and no evidence to suggest that the officers acted with the intent to create an emergency to circumvent the warrant requirement.").

The Court next looks to the objective reasonableness of the Agents' actions as they relate to the exigent circumstances. *See id.* The Court's "first concern in analyzing a claim of a manufactured exigency is whether agents could have obtained a search warrant prior to development of the exigent circumstances upon which they relied." *Rico*, 51 F.3d at 502 (citing *Webster*, 750 F.2d at 327). "There is no question that agents conducting an ongoing investigation do not need to obtain a warrant at the first opportunity." *Richard*, 994 F.2d at 248 (citing *Thompson*, 700 F.2d at 949). "If exigencies arise before agents can obtain a warrant, they can justifiably act." *Id.* However, "without reason to believe that a criminal suspect was aware of police surveillance, the mere presence of firearms or destructible, incriminating evidence does not create exigent circumstances." *United States v. Munoz-Guera*, 788 F.2d 295, 298 (5th Cir. 1986) (citations omitted). Ultimately, to justify a warrantless search based on probable cause and exigent circumstances, the Agents must show that seeking a warrant at that time "would have created risks of a greater magnitude than those which are present in any case where the police

have probable cause but delay entry pending receipt of a warrant." *Munoz-Guera*, 788 F.2d at 298.

The Agents testified that probable cause developed as a result of events stemming from Agent Viera's first knock and talk. A "knock and talk" is "a reasonable investigative tool." *See Newman*, 472 F.3d at 239. However, this is only true when the Agents are not already certain that illegal activity is taking place. *See id.* (defining "knock and talk" as when "the officers [are] not convinced that criminal activity was taking place and did not have any reason to believe the occupants were armed") (quoting *Jones*, 239 F.3d at 721); *see also Jones*, 239 F.3d at 721 ("Once the agents were certain that the occupants were involved in criminal activity, a reasonable 'knock and talk' investigation would have been nugatory."). Indeed, if probable cause already existed when Agents approached the premises, "the warrantless entry became a foregone conclusion once officers knocked." *See Richard*, 994 F.2d at 249 (citing *Munoz-Guerra*, 788 F.2d at 298).

Before Agent Viera performed his first knock and talk, the Agents had at most a reasonable suspicion of illegal activity. Armed only with the knowledge of a dog alert on a small portion of the property and the presence of a known drug trafficker, the Agents had not established with certainty that drug-related activity was taking place on the premises. However, once Agent Viera knocked and announced himself, Mendez appeared, made eye contact with Viera, ignored Viera's request to speak with him, and jumped the fence of the premises. Therefore, it was only after Mendez fled the premises that the Agents had probable cause to believe controlled substances were on the premises. At that point, the Agents' surveillance had been compromised, and they could have reasonably feared that any attempt to turn away and seek a warrant would have resulted in the destruction of evidence. *See Jones*, 239 F.3d at 722 ("[B]ecause the [Agents] has already entered the . . . area, turning away . . . and exiting the

apartment house would have been unreasonable under the circumstances."); *Rodea*, 102 F.3d at 1407 (exigent circumstances were not manufactured because Agents approached the home only after they learned occupants had detected surveillance). Accordingly, it is not the case "the [A]gents had created exigent circumstances by knocking on the door . . . and identifying themselves." *Richard,* 994 F.2d at 249-50. Rather, it was Mendez's decision to run from the Agents – who were at that time acting only on reasonable suspicion – and the sudden flurry of activity inside the premises, that created the exigent circumstances. *See Newman*, 472 F.2d at 239 (fence jumper contributed to exigency "entirely on his own in response to approaching agents, before the police did anything that could be construed as impermissible.").

Accordingly, given that Agent Viera's initial knock and talk was a reasonable investigative tool under the circumstances, the Court holds that the Agents did not manufacture their own exigent circumstances to seize and perform a security sweep of the property.

## III. CONCLUSION

The Court holds that probable cause existed at the time the Agents entered the premises, seized the individuals within, and performed a security sweep of the premises. Moreover, the Court holds that exigent circumstances existed such that the Agents were not required to seek a search warrant before their initial entry onto the premises. Finally, the Court holds that the Agents did not manufacture their own exigent circumstances by their initial knock and talk. Rather, exigent circumstances developed as a result of the actions of third parties who reacted to the Agents' legitimate investigative techniques. *See, e.g., Newman*, 472 F.2d at 239.

Accordingly, Defendant's Motion to Suppress Physical Evidence and Statements (**Doc. No. 45**) is **DENIED**.

**SO ORDERED**.

**SIGNED** on this 17th day of July, 2009.

_____
KATHLEEN CARDONE
UNITED STATES DISTRICT JUDGE